UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CHMM, LLC,

        Plaintiff,

    v.

FREEMAN MARINE EQUIPMENT, INC.,

        Defendant.

Case No. 3:12-cv-01484-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, CHMM, LLC ("CHMM"), an entity organized and existing under the laws of the Marshall Islands, was and is the owner of M/Y JAMAICA BAY III ("Vessel"), a 59.5-meter motor yacht.  NOBISKRUG GmbH ("Nobiskrug") built the Vessel for CHMM at its shipyard in Germany.  Defendant, Freeman Marine Equipment, Inc. ("Freeman"), an Oregon corporation, manufactured and/or supplied a weathertight exterior door for installation on the Vessel in order to provide access from the deck to the interior spaces.

On or about November 16, 2011, while the Vessel was underway, the door failed and allowed seawater to flood the interior of the Vessel, causing severe damage to the Vessel and its contents.  To recover $18 million in economic damages, CHMM filed a Complaint alleging five

1 - FINDINGS AND RECOMMENDATION

tort claims against Freeman for negligence (First Claim), defect in design (Second Claim), defect in manufacture (Third Claim), failure to properly instruct in the installation and use of the door (Fourth Claim), and negligent misrepresentation (Fifth Claim). CHMM asserts admiralty jurisdiction pursuant to 28 USC § 1333 based on the maritime torts or, in the alternative, diversity jurisdiction pursuant to 28 USC § 1332.

Freeman has filed a Motion to Dismiss (docket #11), contending that CHMM has failed to state a claim upon which relief may be granted. Shortly before filing its opposition to that motion, CHMM filed an Amended Complaint adding a Sixth Claim for breach of contract, quasi-contract, and/or warranty.[1] With the consent of the parties, this court construes Freeman's Motion to Dismiss as against the Amended Complaint. For the reasons set for the below, that motion should be granted in part and denied in part.

## STANDARDS

In order to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FRCP 8(a)(2). This standard "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), citing *Bell Atl. Corp. v. Twombly*, 550 US 544, 555 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*, quoting *Twombly*, 550 US at 555. In order to survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*, quoting *Twombly*, 550 US at 570.

---

[1] Contracts relating to the construction of vessels are not considered maritime contracts. *Kossick v. United Fruit Co.*, 365 US 731, 735 (1961). Consequently, claims for breach of such contracts are not within the admiralty jurisdiction. However, the court may exercise diversity jurisdiction over the breach of contract claim.

In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Sateriale v. R.J. Reynolds Tobacco Co.*, 687 F3d 777, 783 (9th Cir 2012). In addition to the allegations of the complaint, the court may also consider documents whose authenticity no party questions which are attached to, or incorporated by reference into, the complaint, as well as matters capable of judicial notice. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F3d 1005, 1016 n9 (9th Cir 2012); *Coto Settlement v. Eisenberg*, 593 F3d 1031, 1038 (9th Cir 2010). The court need not accept as true allegations in the complaint that contradict these sources. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F3d 992, 998 (9th Cir 2010) ("We are not, however, required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citation omitted).

## FINDINGS

### I.  Tort Claims (First through Fifth Claims)

#### A.  Allegations

Pursuant to a Shipbuilding Contract dated April 19, 2006, CHMM purchased the Vessel from Nobiskrug for approximately $41 million. Amended Complaint, ¶ 6; Pruzinsky Decl., ¶ 4, Ex. C.[2] The Vessel was outfitted with a purportedly weathertight door manufactured and/or supplied by Freeman and installed on the exterior bulkhead near the bow, enabling passage from the exterior deck to the inside cabin. Amended Complaint, ¶¶ 12-15. During construction, Freeman representatives visited the shipyard to inspect the door, to oversee its installation, and to further assist with problems experienced by Nobiskrug during installation and testing of the door.

---

[2]  Because the Amended Complaint refers to the Shipbuilding Contract, this court may consider the copy of that contract submitted by CHMM in resolving the motion to dismiss.

3 - FINDINGS AND RECOMMENDATION

*Id*, ¶ 11.  Freeman represented to Nobiskrug and/or CHMM that the door was weathertight and suitable for installation in the forward part of the Vessel.  *Id*, ¶ 12.

The forward compartment of the Vessel housed the owner's, VIP and guest accommodations, the Captain's stateroom, and other interior spaces which were not supplied and installed by Nobiskrug.  *Id, ¶ 10.*  CHMM provided the interior outfitting of the Vessel pursuant to agreements between CHMM and third parties.  *Id*; Pruzinsky Decl., ¶¶ 7-9, Exs. E, F, & G.  These agreements, which were separate and distinct from the Shipbuilding Contract, totaled approximately $10.4 million and related to the purchase, installation and outfitting of woodwork, furnishings, carpeting, and electronics.  Pruzinsky Decl., ¶¶ 7-9, Exs. E, F, & G.  In other words, the Shipbuilding Contract provided for completion and delivery of a Vessel by Nobiskrug with the "Interior Outfit" provided by CHMM.  *Id*, Ex. C, § 2.10(a) & (b); Amended Complaint, ¶¶ 7-11.

Although not alleged, CHMM represented at oral argument that it accepted delivery of the Vessel from Nobiskrug on June 30, 2010, after successful completion of the sea trials.

CHMM alleges that on November 16, 2011, while the Vessel was underway, the door suffered a catastrophic failure in an expectable marine environment which allowed seawater to enter and damage the internal spaces "and the other property contained therein including woodwork, furnishings, insulation, soundproofing, carpeting, electrical wiring, and electronics."  Amended Complaint, ¶¶ 14, 19-20.  The estimated "costs to repair, replace and otherwise restore the Vessel and other property contained therein to the pre-incident condition" is $18 million.  *Id*, ¶ 29.

///

///

4 - FINDINGS AND RECOMMENDATION

The Shipbuilding Contract contains a limited warranty from Nobiskrug (§ 11) and requires Nobiskrug to deliver to CHMM any "assignments of warranties granted by manufacturers of the equipment installed in the Yacht" (§ 7.5(c)(x)). However, CHMM has located no warranty from Freeman relating to the door. Pruzinsky Decl., Ex H ("Kercher Decl."), ¶¶ 2-3. CHMM also has submitted evidence that, under Swiss law which governs the Shipbuilding Contract, Freeman has no standing to claim the benefit of any of its provisions. *Id*, Ex. D ("Cellier Decl."), ¶¶ 5-11.

### B. Economic Loss Rule

Freeman seeks dismissal of the five tort claims based on the economic loss rule under admiralty law. Under admiralty law, a plaintiff may not maintain a tort cause of action and is restricted to contract law "when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss." *East River S.S. Co. v. Transamerica Deleval, Inc.,* 476 US 858, 859 (1986).

In *East River*, defective turbine components damaged only the turbine and interrupted the commercial operation of the vessel. The bareboat charterer of the vessel sought damages in product liability from the turbine manufacturer. The Court restricted the charterer's claim to the contractual warranty between the manufacturer and the purchaser, holding "that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 US at 871. It noted that the "tort concern with safety is reduced when an injury is only to the product itself" and that actions to recover for such economic damage should be "most naturally understood as a warranty claim . . . , mean[ing] simply that the product has not met the customer's expectations." *Id* at 871-72. It further explained as follows:

5 - FINDINGS AND RECOMMENDATION

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*Id* at 872-73 (internal citations omitted).

As later described by the Ninth Circuit, the "economic loss rule serves as a boundary at the intersection of contract and tort law to protect the law of warranty from being absorbed into tort." *All Alaskan Seafoods, Inc. v. Raychem Corp.*, 197 F3d 992, 995 (9th Cir 1999), citing *East River*, 476 US at 866-68.

The Court later applied the *East River* rule in *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 US 875, 880 (1997), to bar tort claims by the buyer of a fishing vessel against both the manufacturer of the vessel and the subcontractor who designed the hydraulic system which malfunctioned, causing the vessel to sink. This corollary to the economic loss rule, known as "the component part rule," bars tort claims against the supplier of a component part which is integrated into the product. *All Alaskan Seafoods*, 197 F3d at 995. "Manufacturers of integrated products can avail themselves of warranty provisions and can spread the risk of product defect over their entire market. . . Alternatively, integrated product manufacturers can exercise market power to impose specifications on component suppliers." *Id*, citing *Saratoga Fishing*, 520 US at 884.

However, the economic loss rule does not completely exclude tort claims for economic loss caused by a defective product. A plaintiff may seek a tort remedy in admiralty when a defective product causes damage to "other property" installed or placed aboard a vessel by the buyer. In *Saratoga Fishing*, 520 US at 877-79, the Court concluded that a plaintiff can recover

6 - FINDINGS AND RECOMMENDATION

in tort for loss to extra equipment (a skiff, a fishing net, spare parts) added by the initial user after the initial purchase and delivery of the vessel and then resold to a subsequent user as part of the vessel.

### C. Application of Economic Loss Rule

CHMM first argues that the economic loss rule does not apply when no contractual or warranty claim against the manufacturer exists, as in this case. It points out that the rule is premised on the existence of a "commercial relationship" between the manufacturer and the purchaser:

> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." The maintenance of product value and quality is precisely the purpose of express and implied warranties. Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.

*East River*, 476 US at 872 (citations omitted).

Although CHMM has a contract with Nobiskrug, it cannot sue Freeman for breach of contract[3] and has been unable to locate any pass-through warranty provided by Freeman.[4] Because it has no contractual warranty remedy against Freeman, CHMM contends that a tort remedy must be available.

However, that argument is based on a misunderstanding of the basis for the economic loss rule. The rule relies upon the parties' opportunity to negotiate a warranty, not on the actual existence of a contractual warranty. As acknowledged by the Supreme Court when explaining

---

[3] At oral argument, CHMM advised that it is also pursuing a claim for damages against Nobiskrug through arbitration pursuant to § 16 of the Shipbuilding Contract.

[4] Pursuant to § 7.5(c)(x), upon delivery of the Vessel, Nobiskrug was required to deliver to CHMM "assignments of warranties granted by manufacturers of the equipment installed in the Yacht, if any." At this juncture, CHMM does not know whether Freeman manufactured the door and whether it provided any warranty to Nobiskrug.

7 - FINDINGS AND RECOMMENDATION

the reason for choosing contract over tort remedies, warranties may not always accompany commercial transactions:

> The commercial buyer and commercial seller *can* negotiate a contract a warranty that will set the terms of compensation for product failure. *If the buyer obtains a warranty*, he will receive compensation for the product's loss, whether the product explodes or just refuses to start. *If the buyer does not obtain a warranty*, he will likely receive a lower price in return. Given the availability of warranties, the courts should not ask tort law to perform a job that contract law might perform better.

*Saratoga Fishing*, 520 US at 880 (emphasis added).

Defining the line of demarcation between contract and tort law, the economic loss rule focuses on the opportunity for the parties to negotiate a warranty and not on the actual inclusion of an express warranty. From a bargaining perspective, CHMM was in the same position as an initial user who enters into one contract with a builder for the new construction and delivery of a completed vessel. It could demand a suitable warranty from Nobiskrug or a lower purchase price. Based on its potential exposure to the risk that is door might fail, Freeman was free to negotiate the allocation of that risk with Nobiskrug by way of express warranties in its subcontract and pass them on to CHMM upon delivery of the Vessel. In addition, as a party to each of the coordinated construction contracts, CHMM was free to negotiate warranties for each of those individual contracts and also to consider how components provided by one vendor might affect components provided by another vendor. Even if CHMM failed to negotiate and obtain a contractual warranty to cover a failure of the door, it cannot obtain a tort remedy against Freeman that does not otherwise exist. *See, e.g., Petroleum Helicopters, Inc. v. Avco Corp.*, 930 F2d 389, 393 (5th Cir 1991) (rejecting plaintiff's claim that the absence of a warranty provision "mandates that [plaintiff] should be allowed to pursue its strict products liability and negligent design and manufacture claims").

8 - FINDINGS AND RECOMMENDATION

Second, CHMM argues that it does not seek to recover damages to the product (Vessel) itself, for which tort claims are barred by the economic loss rule, but seeks to recover damages to "other property." Freeman concedes that if CHMM sought to recover damages only to items added to the Vessel after delivery to CHMM on June 30, 2010, then the economic loss rule would not bar the tort claims. However, CHMM seeks to recover damages to the Interior Outfit and other Purchaser Supplied Property installed prior to delivery of the Vessel to CHMM on June 30, 2010. The issue is whether those items fall within the category of "other property."

In order to determine what constitutes "other property," the court must first define what is the allegedly defective "product." To define the "product," the cases interpreting the economic loss rule use the "object of the contract" analysis. As explained by the Supreme Court, "it is not a component part, but the vessel – as placed in the stream of commerce by the manufacturer and its distributors – that is the 'product' that itself caused the harm." *Saratoga Fishing*, 520 US at 883 (citations omitted); *see also Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F2d 925, 928 (5th Cir 1987), *cert denied*, 485 US 1007 (1988) ("The "completed vessels were obviously the objects of the contract . . . rather than the individual components that make up the vessels."). This maintains the "distinction between components added to a product by a manufacturer before the product's sale to a user, and those items added by a user to the manufactured product." *Saratoga Fishing*, 520 US at 884 (internal citations omitted); s*ee also Sea-Land Serv., Inc. v. Gen. Elec. Co.*, 134 F3d 149, 153 (3rd Cir 1998) ("One looks to the 'object of the bargain'— object purchased or bargained for by the plaintiff, in determining whether additions constitute 'other property.'" ) (citations omitted).

///

///

9 - FINDINGS AND RECOMMENDATION

CHMM contends that the product in this case is the Vessel's empty hull (including the door) which it purchased from Nobiskrug and excludes the Interior Outfit which CHMM agreed to provide, "supply and install."[5]  Shipbuilding Contract, § 2.10(a) & (b).  At a minimum, it argues that, due to a factual dispute, it is premature to determine what constitutes "other property" on a motion to dismiss based solely on the allegations in the Complaint.

The latter argument is easily rejected.  The question of what constitutes "other property" "is a legal question and not . . . a factual determination" and "rests upon a contractual interpretation" of the contract between the parties.  *Petroleum Helicopters*, 930 F2d at 393 n9.  Here the only contract at issue is the Shipbuilding Contract which is referenced in the Amended Complaint and has been submitted to the court for interpretation.

According to the terms of the Shipbuilding Contract, the Interior Outfit was not added after the Vessel was placed in the stream of commerce, but was incorporated into the Vessel during construction and prior to delivery.  Although Nobiskrug did not assume full responsibility or liability for the Interior Outfit (Shipbuilding Contract, § 2.10(a)), it did agree to complete the Vessel in compliance "with the applicable laws, rules, regulations, and enactments" and to "ensure that all requisite inspections by the Flag State, the Classification Society, and any other relevant regulatory authorities take place in a timely manner and with satisfactory results."  *Id*, § 7.6 (a) & (b).  Nobiskrug agreed to deliver the required Classification Certificates to CHMM upon delivery of the Vessel after successful completion of the sea trials.  *Id*, § 7.5(a) & (c).  To that end, CHMM was required to furnish Nobiskrug "with all documentation related to the Interior Outfit which is needed for Classification of the Yacht."  *Id*, § 2.10(c).  In other words,

---

[5]  In contrast, Nobiskrug agreed to install Purchaser Supplied Items delivered by CHMM to Nobiskrug.  Shipbuilding Contract, § 2.9 (a)-(c).

10 - FINDINGS AND RECOMMENDATION

pursuant to the Shipbuilding Contract, Nobiskrug delivered a completely outfitted and legal Vessel, not just a bare hull, to CHMM.

The cases cited by CHMM are distinguishable from the facts alleged here. In *Transco Syndicate #1, Ltd. v. Bollinger Shipyards, Inc.*, 1 F Supp2d 608, 613 (ED La 1998), the court allowed a tort theory of recovery for fire damage to a vessel caused by one of two replacement engines which the plaintiff had purchased from a supplier other than the supplier of the original engines on the vessel when entering the stream of commerce. The court noted the distinction made in *Saratoga Fishing* "between components added to a product by a manufacturer before its initial sale and items added to the product by a subsequent user," which it found consistent with the "object of the contract test" previously adopted by the Fifth Circuit. *Id* at 611 (internal citations omitted). It then distinguished *Shipco* and several other cases in which the plaintiffs "all purchased a single product with integrated parts *from the product's manufacturer*." *Id* at 612 (emphasis in original). Because "[t]he [vessel] was a separate product that was purchased through the stream of commerce from a different supplier at a different point in time," it concluded that any damage caused by the replacement engines "is harm to 'other property.'" *Id* at 613. In contrast, here all of the construction contracts for the Vessel, including those for the Interior Outfit, were entered into and completed prior to the Vessel entering the stream of commerce.

*Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F2d 501 (5th Cir 1989), similarly involved equipment added after the vessel had entered the stream of commerce. Nicor chartered a vessel one year after its construction was completed and subsequently installed its own seismic equipment on the vessel. The court held that "the [vessel], as delivered to Nicor, was the product of that bargain," and the seismic equipment "was, therefore, not part of the

vessel." *Id* at 505-06.  The court therefore allowed recovery in tort for damage caused by the seismic equipment.

*All Alaskan Seafoods* also dealt with products added to a vessel that already had entered the stream of commerce.  Over two years after purchasing the hull of an oil drill ship and spending over $25 million to construct a seafood processing factory on the hull, the plaintiff installed off-the-shelf heating cable on a new drain line using an off-the-shelf cable end cap.  Approximately four years later, the vessel suffered substantial damage allegedly as a result of defects in the heating cable and end cap.  As mass-produced products, the Ninth Circuit noted that the cable and end cap were "not acquired in a negotiated allocation of downstream risk" and, therefore, "[u]nder the principles of product liability, . . . are products and not components."  *All Alaskan Seafoods*, 197 F3d at 996.  In contrast, the Interior Outfit at issue here was acquired by CHMM pursuant to negotiated contracts prior to delivery of the Vessel.

CHMM also points out that other cases denying tort recovery for defective components involved a single contract between the plaintiff and the vessel builder.  The presence of a single contract, however, is not determinative.

In *Petroleum Helicopters,* a helicopter capsized when a float allegedly malfunctioned during an emergency water landing.  The float was manufactured by a third party and included with the helicopter which was sold by the helicopter manufacturer to the plaintiff.  The plaintiff later relocated the float from the original helicopter to the helicopter that capsized.  The plaintiff argued that the capsized helicopter was "other property" because the contract for purchasing the float did not include the damaged helicopter.  *Petroleum Helicopters*, 930 F2d at 393.  Distinguishing *Shipco* and *Nicor*, the Fifth Circuit concluded that the float was a component part of the helicopter, not "other property."  *Id*.  As later summarized by another court:

> [T]he analysis in the "object of the bargain" test is more than a mechanical or formalistic determination of whether the injuring and injured components were sold under the umbrella of the same contract. In *Petroleum Helicopters*, they plainly were not. Instead, the court focused on the fact that the objects of the parties' bargain were the entire helicopter. *Petroleum Helicopters* suggests that spare and replacement parts may therefore be part of the "object of the bargain," regardless of whether or not they are purchased under the same contract.

*Exxon Shipping Co v. Pac. Resources, Inc..*, 835 F Supp 1195 (D Ha 1993).

The recognition that a product can result from multiple contracts entered into by the product owner extends beyond contracts for spare or replacement parts. In *Am. Home Assurance Co. v. Major Tool & Machinery, Inc.*, 767 F2d 446 (8th Cir 1985), the buyer of a turbine entered into a contract with one company for supply of the turbine inner housing and a separate contract with a second company for supply of the turbine case. After construction was completed and the turbine was running, a wear pin caused extensive damage to the turbine vanes and blades. The plaintiff, on behalf of the buyer, claimed that the turbine vanes and blades constituted "other property" for which it could seek recovery in tort. The Eighth Circuit disagreed, holding that the entire turbine was a "single product fabricated under a series of subcontracts." *Id* at 448.

In *Exxon Shipping*, a defective chafe chain on a single point mooring ("SPM") failed, causing a ship to break away from its berth and suffer damage. Sofec manufactured, assembled and installed the SPM which included the defective chafe chain, a buoy, and hoses. The chafe chain manufacturer provided one chain to Sofec and contracted directly with HIRI, the buyer, for a second, spare chafe chain. HIRI also contracted separately for the purchase of the hoses, which were assembled and installed with the rest of the SPM by a Sofec subcontractor. The court reasoned that *Shipco's* "object of the bargain" analysis:

> does not require that the entire product be supplied under a single, umbrella contract. Even a multi-party purchase arrangement, where the purchaser acts as its own general contractor in a series of coordinated

13 - FINDINGS AND RECOMMENDATION

> transactions with several vendors, does not upset the analysis. In such
> cases, the object of the bargain is the acquisition of the completed product,
> even though this object is realized via a series of coordinated transactions
> with several sellers.

*Exxon Shipping*, 835 FSupp at 1201 (citations omitted).

It then precluded tort recovery against the manufacturers of the chafe chain and hoses because they were components of the SPM, an integrated product:

> The fact that the chafe chain may have been the spare purchased directly
> by HIRI rather than the one purchased by Sofec makes no difference. This
> is consistent with *Petroleum Helicopters*. An integrated product may have
> any number of components replaced with spare parts in the ordinary
> course of events. To hold that these parts are "other property" would lead
> to absurd results. Although the hoses were specifically excluded from the
> contract and purchased separately by HIRI, they were intended for
> integration with the rest of the SPM. [Thus], the court finds that HIRI
> purchased the hoses as part of a coordinated series of transactions leading
> to the acquisition of a completed SPM.

*Id*.

Similarly, construction of the Vessel in this case was the result of a coordinated series of transactions leading to the acquisition by CHMM from Nobiskrug of a completed Vessel. The Interior Outfit was integrated into that Vessel. The fact that CHMM entered into several separate, related construction contracts with third parties prior to the Vessel entering the stream of commerce does not affect the "object of the bargain" analysis. Otherwise, the mere existence of a separate contract for part of an integrated product would eviscerate the economic loss rule.

CHMM also argues that its claims for negligence and negligent misrepresentation are not barred by the economic loss rule because they are independent torts. The first four claims allege that Freeman negligently selected and supplied the door for installation on the Vessel, negligently designed and/or manufactured a defective door, and

14 - FINDINGS AND RECOMMENDATION

negligently provided inspection and/or installation instructions for the door. In particular, it alleges that a Freeman representative was present at the shipyard in response to problems experienced with installation of its door. The Fifth Claim alleges Freeman negligently misrepresented the weathertight nature of the door.

Freeman's duty to supply the door arose solely pursuant to a subcontract with Nobiskrug in accordance with the requirements of the Shipbuilding Contract. The presence of its representative during installation was merely to ensure that installation occurred in accordance with that contractual duty. If supervision at a job site to ensure contractual performance could give rise to tort liability, then component manufacturers would have little incentive to ensure proper delivery and installation of their goods. Thus, the economic loss rule bars CHMM's claims based on negligent design, manufacture, inspection or installation. *See, e.g., Sea-land Service*, 134 F3d at 156 (applying economic loss rule to bar claim for negligently repairing an engine connecting rod provided pursuant to a contract); *Apollo Group, Inc. v. Avnet, Inc.*, 58 F3d 477, 481 (9th Cir 1995) ("[The plaintiff] complains that it has failed to receive the anticipated benefit of its bargain. Such benefit of the bargain claims are based in contract law and should be governed thereby.").

In support of its contention that the economic loss rule does not bar its negligent misrepresentation claim, CHMM cites *Otto Candies, LLC v. Nippon Kaiji Kyokai Corp.*, 346 F3d 530 (5th Cir 2003), *cert denied*, 541 US 1009 (2004). However, *Otto Candies* is clearly distinguishable. It did not involve a products liability claim, a construction contract, or the economic loss rule, but instead involved a claim for negligent misrepresentation by a classification society. It held only that "general maritime law cautiously recognizes the tort of negligent misrepresentation as applied to classification societies and that on the specific facts

presented in this case, [the classification society] owed a legal duty to" the plaintiff. *Id* at 532. As the court noted, "a claim for negligent misrepresentation in connection with the work of maritime classification societies should be strictly and carefully limited." *Id* at 535.

A more applicable case is *Apollo Group*, involving a claim for negligent misrepresentation based on information provided by the defendant's representatives relating to the plaintiff's purchase of computer hardware that proved inadequate for its needs. The Ninth Circuit affirmed the dismissal of the negligent misrepresentation claim because the plaintiff sought "to recover purely 'benefit of the bargain'" economic losses and because "[s]uch foreseeable risks could have been – and indeed were – allocated by the parties in their contractual agreement." *Apollo Group*, 58 F3d at 480. The court held that "negligent misrepresentation is not an exception to the 'economic loss' rule." *Id* (applying Arizona law). Oregon courts similarly have held that negligent misrepresentation is not an exception to the economic loss doctrine. *See, e.g., Onita Pac. Corp. v. Trustees of Bronson*, 315 Or 149, 165, 843 P2d 890, 899 (1992) ("In an arms-length negotiation, a negligent misrepresentation is not actionable.").

CHMM seeks to recover for economic losses that arose from a failure of the product (the Vessel) to live up to contract-based expectations. As such, the Fifth Claim for negligent misrepresentation is not based on an independent tort, but rather is based on contract and barred by the economic loss rule.

In sum, CHMM is precluded from tort recovery against Freeman for damage to anything installed on and integrated into the Vessel prior to its delivery by Nobiskrug to CHMM. To the extent that CHMM seeks to recover damage to "other property" added after delivery of the Vessel by Nobiskrug for which tort claims are not precluded, it should be allowed to amend its claims against Freeman accordingly.

## II.    Breach of Contract/Warranty Claim (Sixth Claim)

The Sixth Claim alleges in a conclusory fashion that "[i]f any of the damages alleged herein are governed by principles of contract, quasi-contract, and/or warranty, [Freeman] has breached such provisions, duties and obligations with respect to the failed Door." Amended Complaint, ¶ 93. CHMM concedes that it has no contractual relationship with Freeman and to date has located no warranty from Freeman. However, CHMM explains that it alleges the Sixth Claim as an alternative claim based on the possibility that further investigation may yet uncover a warranty from Freeman of which it is a beneficiary.

Pursuant to FRCP 11(b), a pleading must allege claims which are "warranted by existing law" and factual contentions which "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Given the admitted lack of a contractual relationship and the provisions of the Shipbuilding Contract, this court can conceive of no legal or factual basis for alleging that Freeman is liable to CHMM for breach of contract. Accordingly, that portion of the Sixth Claim should be dismissed.

However, CHMM apparently believes that after a reasonable opportunity for further investigation or discovery, it may find evidentiary support for a breach of quasi-contract or warranty claim. Therefore, assuming that CHMM is willing to accept the risk of Rule 11

sanctions, it is premature to dismiss the alleged breach of quasi-contract or express warranty claim at this juncture.

Moreover, even if discovery fails to uncover an express warranty from Freeman, CHMM asserted at oral argument that it may have a claim under the Uniform Commercial Code against Freeman for breach of an implied warranty. Because the Sixth Claim does not include any allegation for breach of an implied warranty, it is premature to resolve the viability of such a claim at this juncture.

## RECOMMENDATION

For the reasons set forth above, Freeman's Motion to Dismiss (docket # 11) should be GRANTED as to the First through Fifth Claims in the Amended Complaint for damage to property installed on and integrated into the Vessel prior to its delivery by Nobiskrug to CHMM, GRANTED as to that portion of the Sixth Claim in the Amended Complaint alleging a breach of contract, and otherwise DENIED.

To the extent that CHMM seeks tort remedies for damage to "other property" added after delivery of the Vessel by Nobiskrug to CHMM, it should be allowed to amend its tort claims accordingly.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Thursday, January 03, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED December 17, 2012.

                                                                           s/ Janice M. Stewart
                                                                           Janice M. Stewart
                                                                           United States Magistrate Judge